**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**HAROLD WESLEY SLONE,**

     **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　　**Case No.: 3:14-cv-28857**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

<u>**MEMORANDUM OPINION**</u>

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 13). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 4, 7). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

I.　　**<u>Procedural History</u>**

Plaintiff, Harold Wesley Slone ("Claimant"), completed applications for DIB and

SSI on August 22, 2011 and September 6, 2011, respectively, alleging a disability onset date of May 15, 2010, (Tr. at 147, 149), due to "anxiety; steel rod in right leg; torn bulging disc; can't sit for long periods; left shoulder has bone in it; social anxiety; near sightedness; major depression; recurrent personality disorder; avoidant personality disorder." (Tr. at 187). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 15). Claimant filed a request for a hearing, which was held on May 1, 2013 before the Honorable Andrew J. Chwalibog, Administrative Law Judge ("ALJ"). (Tr. at 37-56). By written decision dated May 6, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-26). The ALJ's decision became the final decision of the Commissioner on September 25, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

On November 21, 2014, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on February 5, 2015. (ECF Nos. 10, 11). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 12, 13). Accordingly, this matter is fully briefed and ready for disposition.

## II.   <u>**Claimant's Background**</u>

Claimant was 37 years old at the time of his alleged onset of disability and 40 years old at the time of the ALJ's decision. (Tr. at 25, 41). He completed the eighth grade in school and communicates in English. (Tr. at 42, 186). Claimant's prior work experience includes jobs as an over-the-road truck driver and a hand packager. (Tr. at 24).

III.    **Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of

past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is

not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2015. (Tr. at 17, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since May 15, 2010, the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of back pain secondary to degenerative disc disease, depression, anxiety, and personality disorder. (Tr. at 17-18, Finding No. 3). Claimant also had three non-severe impairments; that being, "steel rod in his right leg," near-sightedness, and obesity. (*Id.*). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or medically equal any of the listed impairments. (Tr. at 18-20, Finding No. 4). Therefore, the ALJ determined that Claimant had the RFC to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can never climb a ladder or scaffold. He can only occasionally climb a ramp and stairs, balance, stoop, kneel, crouch, and crawl. He must avoid concentrated exposure to cold, vibrations, and hazards. He can learn and perform routine work-related activities, but the

> task should be low stress with no supervisory responsibilities and no fast-paced production requirements. The job setting should call for no more than occasional and superficial social interaction and supervision should be low-key, supportive and not over-the-shoulder.

(Tr. at 20-24, Finding No. 5). At the fourth step of the analysis, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 24, Finding No. 6). Consequently, the ALJ considered Claimant's past work experience, age, and education in combination with his RFC under the fifth and final step to determine if he would be able to engage in substantial gainful activity. (Tr. at 25-26, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1972 and was defined as a younger individual on the alleged disability onset date; (2) he had a limited education but could communicate in English; and (3) transferability of job skills was not material to the ALJ's disability determination because the Medical-Vocational Rules supported a finding of non-disability regardless of Claimant's transferable job skills. (Tr. at 25, Finding Nos. 7-9). Taking into account all of these factors, and Claimant's RFC, and relying upon the opinion testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 25-26, Finding No. 10). At the light level, he could be a house sitter, order clerk, or assembler; and at the sedentary level, Claimant could work as a bench worker, final assembler, and laminator. (Tr. at 26). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act from May 15, 2010 through the date of the decision. (Tr. at 26, Finding No. 11).

## IV.  **Claimant's Challenge to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is not supported by substantial evidence, because the ALJ failed to give proper weight to the opinion of Claimant's

treating psychiatrist, Dr. Mohit Bhardwaj, who stated that Claimant had extreme limitations in his ability to interact with others and to respond to changes in the work setting; had marked limitations in his ability to understand, remember, and carry-out complex instructions and make complex business decisions; and would likely miss five or more work days each month. (ECF No. 12 at 4). Claimant also contends that the ALJ rejected Dr. Bhardwaj's opinion despite supporting evidence and, instead, gave great weight to the opinion of Dr. Jim Capage, a non-examining agency consultant who issued his opinion without the benefit of many of Claimant's later-acquired treatment records. (*Id.* at 5-6).

The Commissioner responds by asserting that the ALJ properly rejected Dr. Bhardwaj's "extreme" limitations as they were not substantiated by his counseling and medication management notes, which reflected only conservative therapy. (ECF No. 13 at 9-10). Furthermore, the Commissioner argues that Dr. Capage's opinions were not only supported by the evidence available at the time, but were affirmed by a second agency consultant who had access to Claimant's treatment records and noted that Claimant's symptoms had actually improved. (*Id.* at 10). According to the Commissioner, the ALJ wholly accounted for Claimant's mental limitations in the RFC finding, and despite the limitations, a vocational expert found available work that Claimant was capable of performing. (*Id.* at 12). Therefore, the decision of non-disability was supported by substantial evidence.

## V.   **Relevant Medical Records**

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. *Treatment Records-Prestera Center for Mental Health*

On August 2, 2011, Claimant presented to Prestera Center for Mental Health ("Prestera"), having been referred by his attorney for symptoms of depression, insomnia, anxiety, and racing thoughts. (Tr. at 269, 297). Claimant was evaluated by Nikki Clatos, B.A. Claimant advised Ms. Clatos that he had recently signed up for SSI and DIB, and he had not worked for over a year. Claimant reported that he quit his last job as an over-the-road trucker after receiving a DUI charge when driving his personal automobile. He indicated that he had worked at numerous jobs during the prior eight years, but had experienced difficulty keeping a job. Claimant complained that after a while at a job, he would begin to believe people were talking about him, or he would think he was not doing a good job, so he would quit. (*Id.*). Claimant listed his current symptoms as depression with withdrawal, irritability, apathy, low energy, loss of interest in previous activity, anxiety with excessive worry and agitation, insomnia, guilt feelings, and low self-esteem. (Tr. at 269). Claimant reported that he and his wife of twenty-two years were having marital problems related to his grouchiness. He had no friends, because he experienced difficulty interacting with others. Claimant described feeling irritable when family and friends came to his house. He remarked that his irritability had worsened since he quit his job. (Tr. at 269-70).

With respect to his history of mental health treatment, Claimant stated that he took DUI classes for six weeks after being charged with that crime. (Tr. at 297). However, he did not feel that counseling was helpful. Claimant had no primary care physician, but reported having medical concerns including chronic pain, headaches, tobacco abuse, shortness of breath, and sleep disturbance. (Tr. at 270, 298). He had never taken medication to treat his depression. (Tr. at 270). As far as social history,

Claimant stated that he lived with his wife in Fort Gay, and they had adopted one child together, who was thirty years old and lived about five miles away. (Tr. at 298). Claimant's son and his five children visited frequently. Claimant indicated that he and his wife had helped raise their grandchildren. (Tr. at 299). Claimant's mother was deceased, but his father lived in the area, and Claimant saw him about once every month. Claimant also reported that he attended church services with his wife.

Ms. Clatos performed a mental status examination of Claimant. (Tr. at 270-72). Claimant appeared withdrawn, but had normal speech and thought content. He was oriented in all four spheres. Claimant's memory was normal, but his affect was blunted,and he had deficient coping skills. (Tr. at 271). Claimant's eye contact was appropriate; his motor activity was normal; and he had no suicidal or homicidal thoughts. Ms. Clatos assessed Claimant with Major Depressive Disorder, recurrent, moderate, and Anxiety Disorder, not otherwise specified ("NOS"). (Tr. at 272, 301). She felt that Claimant had symptoms of depression, anxiety, and insomnia coupled with low self-esteem and feeling of guilt. (Tr. at 300-301). Ms. Clatos believed that Claimant would benefit from therapy and a psychiatric evaluation to determine medication management. (Tr. at 268, 300). She felt that Claimant had a good prognosis and assigned him a Global Assessment of Functioning Score of 60.[1] (Tr. at 300-01). On the

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

same date, Ms. Clatos completed an informational database on Claimant. (Tr. at 279-86). She noted that Claimant had not received intensive psychiatric treatment in the past and reiterated that he needed to be evaluated for medication management by Dr. Mohit Bhardwaj and receive counseling from Linda Goad, M.A. (Tr. at 281-82, 286).

Claimant saw Dr. Mohit Bhardwaj on August 8, 2011 for a psychiatric evaluation. (Tr. at 275-78, 302-05). Claimant reported feeling anxious, indicating that he had felt anxious most of his life, but his symptoms had increased recently after he was falsely accused of child neglect. (Tr. at 275, 302). Claimant described feeling worried all of the time. He complained of decreased sleep, decreased self-esteem, low energy level, and a lack of interest in prior activities. Claimant admitted to experiencing difficulties with social interaction, which he believed had caused him to lose jobs. However, he denied a history of psychiatric treatment and had never attempted suicide. (*Id.*). Dr. Bhardwaj performed a mental status examination of Claimant. He noted that Claimant was alert, cooperative, and calm, but his eye contact was avoidant. (Tr. at 275-76, 302-03). Claimant's affect was constricted, but his thought content and processes were normal.

Dr. Bhardwaj diagnosed Claimant with Major Depressive Disorder, recurrent, moderate, and Avoidant Personality Disorder. (Tr. at 277, 304). His GAF score was 55. (Tr. at 277, 304). Dr. Bhardwaj felt that Claimant's prognosis was guarded due to his personality disorder; although, he believed that Claimant might do substantially better because he did not have any substance abuse issues. (Tr. at 276, 303). Dr. Bhardwaj prescribed Celexa and Xanax. He also suggested that Claimant use Benadryl to help him sleep. Lastly Dr. Bhardwaj arranged for Claimant to begin psychotherapy. (*Id.*).

Dr. Bhardwaj saw Claimant again on August 15, 2011 for medication management. (Tr. at 287-90, 306-09). Claimant's symptoms had not changed; however,

he was not taking his medication as prescribed. (Tr. at 287, 306). Claimant's mental status examination was essentially normal, except his affect was blunted, his coping skills were deficient, and sleep was inadequate. (Tr. at 287-88, 306-07). Claimant's diagnoses and GAF score remained the same. (Tr. at 289, 308). Dr. Bhardwaj increased Claimant's Xanax, prescribed trazadone for sleep, and told him to continue with Celexa. (*Id.*).

After his evaluation by Dr. Bhardwaj, Claimant met with Linda Goad, M.A., for an hour of psychotherapy. (Tr. at 273). The primary purpose of the meeting was to assess Claimant's individual counseling needs and identify adaptive coping skills to improve his mood and increase his activities. Claimant presented with dysthymic mood and congruent affect. He related having a long history of alcohol abuse, but claimed that he had not abused alcohol in four years. Claimant stated that he had difficulty controlling his moods and felt his depression had increased since he stopped working. Ms. Goad felt Claimant was responsive to therapy and planned to continue with individual counseling. (*Id.*).

Claimant returned for counseling with Ms. Goad on August 26, 2011. (Tr. at 274). Claimant continued to have depression and also complained of social anxiety. He stated that he isolated himself and did not want to engage in activities with others. He complained that his son and his son's five children would come to Claimant's house and would "never leave." (*Id.*). Claimant was hesitant to ask his son to go, fearing that he would appear mean. Ms. Goad discussed the need to express his feelings and establish boundaries.

On August 29, 2011, Claimant returned to Prestera to see Dr. Bhardwaj. (Tr. at 291-94). Claimant reported having better mood and sleep, but still had a low energy

level. Dr. Bhardwaj noted that Claimant was still not taking his medications as prescribed; he was using more Xanax than instructed, because "it was wearing off fast." (Tr. at 291). Claimant's mental status examination was essentially normal, except his affect was a "little constricted." (*Id.*). His diagnoses remained the same, and his GAF score was 50.[2] (Tr. at 310). Dr. Bhardwaj prepared a disability form for Claimant, increased his dosages of Xanax and Celexa, and instructed him to maintain a healthy lifestyle by eating healthy foods and getting moderate exercise. (*Id.*). Claimant was supposed to return for psychotherapy on September 2, 2011 and November 14, 2011, but he failed to show. (Tr. at 296, 357).

On November 29, 2011, Claimant returned to Prestera for a medication management session with Dr. Bhardwaj. (Tr. at 352-55). Claimant's mental status examination was normal, except for his coping skills, which were still described as "deficient." (Tr. at 352-54). His diagnoses remained the same, but his GAF score had returned to 55. (Tr. at 354-55). Dr. Bhardwaj recommended decreasing Claimant's Xanax by .5 mg and increasing his Celexa. Claimant was instructed to continue with psychotherapy. (Tr. at 352).

Claimant had an individual counseling session with Ms. Goad on December 9, 2011. (Tr. at 351). Claimant's mood was noted to be improved and congruent with his affect. He complained of social anxiety, but indicated that Xanax reduced his symptoms. He expressed concern over Dr. Bhardwaj's decision to reduce his dosage of Xanax. Claimant discussed with Ms. Goad his values of being a good grandfather and indicated that he played with his grandchildren and hung Christmas lights. (*Id.*). However,

[2] A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment. DSM-IV at 32.

- 12 -

Claimant did not appear for his next therapy session scheduled on December 30, 2011. (Tr. at 358).

On January 10, 2012, Claimant saw Dr. Bhardwaj for medication management. (Tr. at 395-98). Claimant reported that the increased dosage of Celexa was helping to improve his mood, sleep, and concentration, and increase his energy. (Tr. at 395). Claimant's mental status examination was normal, with his coping skills described as "improving." (Tr. at 396). Claimant's diagnoses were unchanged, but his GAF score had increased to 60, a score on the borderline between moderate and mild symptoms. (Tr. at 397-98). At a follow-up visit on February 27, 2012, Claimant continued to express improvement. (Tr. at 399). His mental status examination was normal, and his diagnoses and GAF score were unchanged. (Tr. at 400-02).

At his medication management meeting with Dr. Bhardwaj on April 9, 2012, Claimant reported that he was still doing fine on Xanax, Celexa, and trazodone. (Tr. at 403). He was encouraged to maintain a healthy lifestyle and get into psychotherapy. (*Id.*). Claimant's mental status examination was normal, except his affect was noted to be restricted. (Tr. at 403-05).His diagnoses remained the same, and his GAF score was still 60. (Tr. at 405-06).

Claimant appeared for psychotherapy on April 16, 2012. (Tr. at 407). Ms. Goad observed that Claimant was depressed, with a constricted affect, irritability, and agitation. He stated that people aggravated him, and he wanted to isolate himself. He felt his grandchildren were present all of the time, which made him anxious and irritable. Claimant was growing a garden, and Ms. Goad suggested that he have his grandchildren help him with the garden. (*Id.*).

On June 18, 2012, Claimant returned for a medication management session with

Dr. Bhardwaj. (Tr. at 408-11). He reported some anxiety related to a diagnosis received by his wife that required surgery. However, he stated that he had gone camping over the weekend and enjoyed it. (Tr. at 408). Claimant's mental status examination was normal, except for a restricted affect. (Tr. at 408-09). Claimant's diagnoses remained the same, and his GAF score was 60. (Tr. at 410). Dr. Bhardwaj decided to continue Claimant on his current medications and instructed him to maintain a healthy lifestyle. (Tr. at 410-11).

On July 16, 2012, Dr. Bhardwaj noted that Claimant was doing fine, although his wife's medical problems were causing him stress. (Tr. at 412). Claimant also mentioned that he was struggling with finances as he waited for a ruling on his disability application. Claimant's mental status examination was within normal limits; his diagnoses were unchanged; and his GAF score was 60. (Tr. at 413-14). Dr. Bhardwaj added melatonin to Claimant's medication regimen and recommended that he continue with therapy. (Tr. at 414). Claimant's condition had not changed at his next medication management session on September 10, 2012, and Dr. Bhardwaj's diagnoses and instructions remained the same. (Tr. at 415-17). He documented that Claimant's attorney wanted a mental status evaluation from Prestera.

At his medication management session on October 8, 2012, Claimant continued to do well and was sleeping better. (Tr. at 418). He was still struggling financially, but his mental status examination was within normal limits except for a constricted affect. (Tr. at 418-19). Dr. Bhardwaj noted that Claimant was not attending counseling sessions, stating that he did not want to go as he was not "comfortable." (Tr. at 420). His medications, diagnoses, and GAF score were unchanged. (Tr. at 419-20). There were also few changes at Claimant's next four visits on November 12, 2012, December 10,

2012, January 7, 2013, and March 18, 2013. (Tr. at 425-34, 437-41). In November 2012, Dr. Bhardwaj added Remeron to Claimant's medications to boost the effect of his antidepressant, and he increased the dosage in January 2013. (Tr. at 427, 430, 433).  In March 2013, Dr. Bhardwaj recommended that Claimant see a primary care physician, because he had been throwing up twice per week for two months. (Tr. at 437). Dr. Bhardwaj explained to Claimant that his electrolytes could become imbalanced from vomiting.

### B.  RFC Evaluations and Opinions

On September 23, 2011, Claimant was examined by David L. Winkle, M.D., at the request of the SSA. (Tr. at 313-16). Although Dr. Winkle primarily assessed Claimant's physical limitations, he noted that Claimant alleged anxiety and depression. Claimant reported seeing a counselor at Prestera on a weekly basis and taking psychotropic medications. (Tr. at 313). He described having panic attacks four or five times per day and having difficulty being around people. Dr. Winkle documented that Claimant's mental status was normal, with appropriate mood and affect. (Tr. at 315). However, based upon the history provided by Claimant, Dr. Winkle suggested that Claimant work in a fairly quiet environment. (Tr. at 315-16).

On October 6, 2011, Dr. Jim Capage completed a Psychiatric Review Technique pertaining to Claimant. (Tr. at 319-32). Dr. Capage opined that Claimant had an affective disorder, an anxiety-related disorder, and a personality disorder, although none of them precisely satisfied the diagnostic criteria for the disorders. (Tr. at 319, 322, 324, 326). Under paragraph B criteria, Dr. Capage found that Claimant was mildly limited in activities of daily living, and moderately limited in social functioning and maintaining persistence, pace, and concentration. (Tr. at 329). Claimant had no

episodes of decompensation of extended duration. Dr. Capage also found no evidence of paragraph C criteria. (Tr. at 330).

Dr. Capage completed a Mental Residual Functional Capacity Assessment from, as well. (Tr. at 333-36). He determined that Claimant was not significantly limited in most work-related tasks, but had moderate limitations in seven activities, including: the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual; the ability to work in coordination or proximity to others without being distracted; the ability to complete a normal work day and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number of breaks; the ability to accept instructions and respond appropriately to criticism; and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 333-34). Dr. Capage summarized his functional assessment by stating that Claimant could learn and perform routine work-related activities, but should have low stress tasks with no supervisory responsibilities and no fast-paced production requirements. His job setting should require no more than occasional and superficial social interaction, and his supervisors needed to be low-key, supportive, and not over-the-shoulder. (Tr. at 335). Dr. Capage's assessment was affirmed by Jeff Boggess, Ph.D., on February 22, 2012. (Tr. at 368-81).

On August 29, 2011, Dr. Bhardwaj completed a Mental Residual Functional Capacity Evaluation at Claimant's request. (Tr. at 391-94). He found Claimant to be moderately limited in his ability to: carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal work day and work week

without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number of breaks; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work place; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. (Tr. at 391-92). He also opined that Claimant was markedly limited in his ability to: work in coordination or proximity to others without being distracted; interact appropriately with the public; ask simple questions; accept instructions and respond appropriately to criticism; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to travel to unfamiliar places or use public transportation. (*Id.*). Dr. Bhardwaj concluded that Claimant's avoidant personality disorder markedly limited his social interactions, and his functioning in other areas varied with the extent of his depression. (Tr. at 393).

Dr. Bhardwaj completed a second mental RFC assessment on October 8, 2012. (Tr. at 421-24). He stated that Claimant had "very severe" mental impairments and symptoms with a guarded prognosis, although his GAF score was 60. (Tr. at 421). Dr. Bhardwaj opined that Claimant was moderately impaired in his ability to make simple work-related decisions; markedly impaired in his ability to understand, remember, and carry-out complex instructions or make complex work-related decisions; and was extremely impaired in his ability to interact with others. (Tr. at 422). Claimant had a variety of marked symptoms including loss of energy, blunted affect, anxiety, mood disturbance, difficulty thinking and concentrating, and apprehension. He was moderately isolated; had deeply ingrained, maladaptive patterns of behavior; was easily distracted; had severe panic attacks; and had markedly disturbed sleep. (Tr. at 423).

Despite Claimant having all of these signs and symptoms, Dr. Bhardwaj opined that Claimant was capable of managing benefits in his own best interests. (Tr. at 424).

On May 10, 2013, Dr. Bhardwaj answered specific questions posed by Claimant's counsel. (Tr. at 442). Dr. Bhardwaj opined that Claimant was not capable of full-time employment, because he suffered from significant depression, low energy, and significant social anxiety. Dr. Bhardwaj attempted to explain how his RFC assessments, which contained some areas of marked and extreme limitations, was consistent with the consistent GAF scores of 60, by indicating that Claimant's symptoms fluctuated daily and ranged from moderate to serious. (*Id.*).

## VI.   **Scope of Review**

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate

question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.   <u>Analysis</u>

As previously stated, Claimant's sole challenge to the Commissioner's disability determination involves the weight given by the ALJ to the opinions of Dr. Bhardwaj. When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. §§ 404.1527(c), 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic

techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[3] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4 (S.S.A. 1996). Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review;" otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d.

700, 705 (3rd Cir. 1981)). Although 20 C.F.R. §§ 404.1527(c),416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon the various factors, the regulations do not explicitly require the ALJ to regurgitate in the written decision every facet of the analysis. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2).

Here, the ALJ complied with the applicable regulations by considering all of the medical source statements—including the RFC assessments prepared by Dr. Bhardwaj—in conjunction with the other evidence. (Tr. at 20-24). Starting first with anecdotal records and Claimant's testimony, the ALJ observed that, despite complaining of numerous psychological symptoms, Claimant did not seek any psychiatric care until August 2011, when his disability attorney referred him to Prestera. (Tr. at 22). At that time, he reported his symptoms as being "mild to moderate." He admitted that he had voluntarily quit his job and was "not looking" for employment. (*Id.*). Although Claimant stated that his problem being around other people had been long-standing, he denied any history of mental health counseling or psychotropic medication. Earlier in the decision, the ALJ noted that Claimant had no difficulties with personal care, watched a great deal of television, started a garden, played video games, and helped his son raise five children. Although he described himself as a "loner," Claimant saw his son and grandchildren frequently, went to church occasionally, and had no problem with authority figures. Claimant could concentrate long enough to watch a movie through to its end, and he conceded that he had no significant impairment in following written and spoken instructions. (Tr. at 19).

- 22 -

Moving next to the medical evidence, the ALJ thoroughly reviewed the records pertaining to Claimant's care at Prestera. The ALJ discussed Claimant's mental status examinations, which revealed that Claimant had normal thought content, full orientation to all spheres, and a normal memory. (Tr. at 23). After several weeks on medication, Claimant reported improvement in his mood and sleep, fair appetite, and improving concentration. Claimant was observed to be well-oriented, friendly, and cooperative on mental status examination. He made good eye contact, and his affect was stable and appropriate. By November 2011, Claimant reported increased energy, fair appetite, and improving concentration. He indicated that the medications were helpful, and he had no side effects from taking them. The ALJ emphasized that Claimant continued to report improvement with medication and had normal mental status examinations. (*Id.*).

After considering the anecdotal evidence, Claimant's testimony, and the medical records, the ALJ addressed the opinions offered by Dr. Bhardwaj. (Tr. at 24). The ALJ reviewed all of the marked and extreme functional limitations provided by Dr. Bhardwaj, but discounted them as being inconsistent with his treatment records and with the counseling notes. The ALJ gave great weight to the agency consultant's RFC assessment, finding it more consistent with the evidence as a whole. Clearly, the ALJ complied with Social Security regulations and rulings in the manner in which he assessed the opinions. *See Bishop v. Commissioner of Social Security,* 583 F.App'x 65, 67 (4th Cir. 2014) (ALJ's findings that a treating physician's opinion was neither consistent with the record, nor supported by the medical evidence, were appropriate reasons to discount the opinion). The ALJ expressly weighed the relevant opinions and briefly explained the reason for the weight given to the opinions. The ALJ considered all

of the evidence in making his determinations, including objective findings; testimony; Claimant's reported activities; counseling notes; and the side effects of Claimant's medications. Contrary to Claimant's contention, the ALJ plainly understood that Dr. Bhardwaj was Claimant's treating psychiatrist. Not only did the ALJ thoroughly review and reference Dr. Bhardwaj's treatment notes, but the specific reason the ALJ gave for discounting Dr. Bhardwaj's RFC assessments was that the opinions expressed in the assessments were inconsistent with Dr. Bhardwaj's own treatment notes. (Tr. at 24).

Moreover, Claimant's contention that the ALJ erred by accepting Dr. Capage's opinion, which predated much of Claimant's treatment at Prestera, is unpersuasive. The weight of an agency consultant's opinion does not rest solely upon the date that the opinion was issued. *See Starcher v. Colvin*, No. 1:12-01444, 2013 WL 5504494, at *7 (S.D.W.Va. Oct. 2, 2013). In *Starcher*, the Court explained that "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. *Only where 'additional medical evidence is received that in the opinion of the [ALJ] ... may change the State agency medical ... consultant's finding ... is an update to the report required.*" *Id.* (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011)) (emphasis added) (ellipses and brackets in original). Consequently, when reviewing a final decision that is based primarily upon an early-issued medical source statement, the court must examine the record to determine if after-acquired medical evidence might reasonably alter the medical source's findings, and thus require an updated evaluation. In this case, although Dr. Capage rendered his opinion only a few months after Claimant initiated treatment with Prestera, his opinion was confirmed in

February 2012 by a second agency consultant. More importantly, Claimant's condition did not deteriorate during the time frame after Dr. Capage conducted his review. To the contrary, as the Commissioner points out, Claimant continued to improve.

Having fully assessed the ALJ's discussion, and comparing it to the record, the undersigned agrees that substantial evidence supports a finding that Claimant is not disabled under the Social Security Act. The limitations noted in Dr. Bhardwaj's RFC assessments are simply too extreme when compared to the findings in his treatment records. Dr. Bhardwaj regularly gave Claimant a GAF score of 60. The score was intended to reflect how Dr. Bhardwaj viewed the severity of Claimant's symptoms at each appointment. Given that a score of 60 falls on the borderline between moderate and mild symptoms, there is no medical explanation for the severe limitations included by Dr. Bhardwaj in the RFC assessments. It was only when prodded by Claimant's disability counsel that Dr. Bhardwaj rated Claimant's symptoms as moderate to "serious." Moreover, Dr. Bhardwaj's notes document consistent reports by Claimant that his condition was improved with medications. Furthermore, the majority of the findings on Claimant's mental status examinations were within normal limits. Also inconsistent with the severe limitations noted in Dr. Bhardwaj's assessments was Claimant's decision to voluntarily terminate counseling sessions. Claimant explained the decision by stating that he was not "comfortable" with therapy. If Claimant had been as emotionally compromised as Dr. Bhardwaj described in his RFC assessments, it seems only logical that he would have insisted that Claimant continue with psychotherapy. In sum, the documentation in Dr. Bhardwaj's records and the counseling notes do not support a finding that Claimant is any more than moderately limited in some mental work-related functions. The ALJ accepted the presence of moderate deficits and accounted for them

by incorporating all of the RFC limitations recommended by Dr. Capage and affirmed by Dr. Boggess. Accordingly, the ALJ did not err in the weight he gave to Dr. Bhardwaj's RFC findings.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to counsel of record.

**ENTERED:**  December 3, 2015

Cheryl A. Eifert
United States Magistrate Judge